IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
GREAT FALLS DIVISION

|  |  |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>vs.<br><br>ERIC BRUCE FOWLER,<br><br>Defendants. | CR-20-30-GF-BMM<br><br><br><br>ORDER |

The United States indicted Defendant Eric Bruce Fowler ("Fowler") on two counts stemming from a traffic stop on the Fort Peck Indian Reservation ("FPIR"). Doc. 1. Count I charges Fowler with Prohibited Person in Possession of Firearm, in violation of 18 U.S.C. § 922(g)(1). *Id*. at 1. Count II charges Fowler with Possession of an Unregistered Firearm, in violation of 26 U.S.C. § 5861(d). *Id*.

Fowler filed a Motion to Suppress. Doc. 22. Fowler argues that Montana Highway Patrol ("MHP") Trooper Moon ("Trooper Moon") exceeded his authority when he stopped Fowler within the exterior boundaries of the FPIR and any evidence stemming from the traffic stop must be suppressed. Doc. 23. The Court held a hearing on December 11, 2020. Doc. 70.

1

## BACKGROUND

Trooper Moon saw Fowler driving on Highway 2 east of Wolf Point, Montana. Doc. 22-4 at 5. Trooper Moon began following Fowler after Fowler made a U-turn and headed back into Wolf Point, Montana. Trooper Moon saw that Fowler's car did not have a license plate or a temporary tag. *Id*. Trooper Moon initiated a traffic stop. *Id*. The entire interaction occurred within the exterior boundaries of the FPIR.

Fowler got out of the car shortly after pulling over. Trooper Moon knew from previous interactions that Fowler was an Indian Person. Fowler left the driver's door open while he talked with Trooper Moon. *Id*. Trooper Moon asked Fowler to move away from the car after seeing a pry bar just inside the driver's door. *Id*. Trooper Moon searched Fowler for weapons. *Id*.

Trooper Moon saw through the back window of the car a rifle lying in the back seat. *Id*. at 6−7. Fowler said that he was only working on the car and that Kevin Jackson owned the car. *Id*. MHP Dispatch informed Trooper Moon that Fowler had registered as a violent offender and possessed a revoked driver's license. *Id*. Fowler had no tribal warrants. *Id*. Fowler admitted that he was on state probation. *Id*. Trooper Moon called Fowler's probation state officer, Bruce Barstad ("Officer Barstad"), and told him about the rifle and that Fowler would have seen it in the car. *Id*. Officer Barstad advised Trooper Moon to forgo a probation search

and handle "the stop the proper way on the reservation." *Id*. Trooper Moon understood this to mean he should seize the car and pursue a tribal search warrant. *Id*.

Trooper Moon gave Fowler a warning for driving without a license plate infraction and citations for driving without a license, driving without insurance, and driving without a seatbelt. *Id*. at 6. Trooper Moon included a summons to tribal court because Fowler was an Indian Person and the violations occurred on the FPIR. *Id*. Fowler asked Trooper Moon to retrieve his coat and house keys from the car. Trooper Moon went to get Fowler's belongings and saw a blue marijuana grinder in the pocket of the driver's door. *Id*. Fowler took his belongings and left on foot. *Id*.

Trooper Moon deployed his canine while waiting for the tow truck to arrive. The canine alerted at the driver's door and at the rear of the car where Fowler had been standing. *Id*. Trooper Moon had the car towed to Roosevelt County Sheriff Office secure storage. *Id*. Trooper Moon obtained a tribal search warrant from the Fort Peck Tribal Court and searched the vehicle. Trooper Moon found, among other items, a sawed-off shotgun, a rifle, various knives and ammunition, and drug paraphernalia, including scales, vials, and a glass pipe with suspected marijuana residue. *Id*. at 9.

ANALYSIS

**CROSS-DEPUTIZATION AGREEMENTS.**

Criminal jurisdiction in and around Indian Country proves complicated. *See generally* Kevin Morrow, *Bridging the Jurisdictional Void: Cross-deputization Agreements in Indian Country*, 94 N.D. L. REV. 65 (2019). Indian tribes generally operate as separate and sovereign governments within Indian Country. Pursuant to various statutes, the federal government also exercises jurisdiction in Indian Country. *Los Coyotes Band of Cahuilla & Cupeno Indians v. Jewell*, 729 F.3d 1025, 1030 (2013); 18 U.S.C. § 1152. States generally lack jurisdiction in Indian Country. Some tribes have allowed states concurrent criminal jurisdiction, however, to enforce state laws in Indian Country. Other tribes have rejected this arrangement. *See County of Lewis v. Allen*, 163 F.3d 509, 514 (9th Cir. 1998).

The complexity of criminal jurisdiction with Indian Country, when compounded with limited police resources and vast reservations, often results in ineffective law enforcement and a much higher rate of crime in Indian Country. *Los Coyotes*, 729 F.3d at 1030. Acts committed in Indian Country can be subject to federal, state, or tribal jurisdiction depending on the severity of the crime and on whether the actor or victim are Indian persons. *United States v. Patch*, 114 F.3d 131, 133 (1997).

Some jurisdictions have sought to cut the gordian knot by enacting cross-deputization agreements. Cross-deputization agreements are arrangements by which one jurisdiction commissions law enforcement officers of another jurisdiction to enforce laws that the law enforcement officers would otherwise be without jurisdiction to enforce. *See Bridging the Jurisdictional Void*, 85−86. Tribes can freely enter cross-deputization agreements with county governments, city governments, or state governments. Cross-deputizations agreements between a tribe and the federal government constitutes a special subset of cross-deputization agreements called Special Law Enforcement Commission ("SLEC") agreements. *Hopland Band of Pomo Indians v. Norton*, 324 F.Supp.2d 1067, 1068−69 (9th Cir. 2013).

In 2000, the Assiniboine and Sioux Tribes of the Fort Peck Indian Reservation ("the Tribes") entered into a cross-deputization agreement ("2000 CDA") with various neighboring local governments and the MHP. Doc. 28-3. The 2000 CDA represents more than a mere memorandum of understanding between the various jurisdiction. The 2000 CDA constitutes a provision of the Tribes' governing law, equivalent to a section of the United States Code or the Montana Code. *See Fourstar v. Riden*, 2018 WL 6421736, at *2 (D. Mont. 2018). The Tribes entered into the 2000 CDA pursuant to Article VII, Section 1 of the Constitution and Bylaws of the Assiniboine and Sioux Tribes of the Fort Peck Reservation. Doc. 28-3 at 1. The

Tribal Executive Board adopted tribal resolutions incorporating the 2000 CDA and deputizing Trooper Moon. *Id*. at 1–2.

The effect of the 2000 CDA proves relatively simple. The Tribes appoint certain MHP troopers to serve as commissioned law enforcement officers of the Tribes. *Id*. at 4. When the cross-deputized troopers operate within the exterior boundaries of the FPIR, they possess the same authority to enforce tribal law that tribal officers possess. *See Fourstar*, at *2.

### FOWLER'S MOTION TO DISMISS

The Tribes sought to amend the 2000 CDA in 2003. Doc. 22-1 at 1. The sole purpose of the 2003 Amendment was to include Valley County, Montana, as a party to the 2000 CDA. The purpose, legal foundation, and required procedures of the 2000 CDA remained unchanged. *Compare* Doc. 28-1 *with* Doc. 22-1.

Fowler asserts that Trooper Moon lacked jurisdiction to stop Fowler within the FPIR because the 2003 Amendment does not satisfy the requirements of a Special Law Enforcement Commission ("SLEC") agreement. Doc. 23 at 3; Doc. 22-2. Fowler cites the lack of a signature from the Secretary of the Interior as the invalidating deficiency of the 2003 Amendment. Doc. 71 at 4-5. Fowler's argument confuses cross-deputization agreements between the State of Montana and the Tribes with SLEC agreements between the federal government and the Tribes.

The requirements of a SLEC agreement are irrelevant to the validity of the 2000 CDA. The initial traffic stop and subsequent search of Fowler's car did not implicate the federal government or tribal officers enforcing federal law. SLEC agreements represent cross-deputization agreements between the federal government and a tribe. *See Hopland Band of Pomo Indians*, 324 F.Supp.2d at 1068. SLEC agreements allow tribal law enforcement officers to enforce federal law in Indian Country. SLEC agreements require consent of the federal government because the federal government serves as a party to the agreement. Standard cross-deputization agreements (*i.e.*, non-SLEC agreements) do not require the signature of the Secretary of the Interior because the federal government has no involvement.

The lack of a signature from the Secretary of the Interior has no effect on the 2003 Amendment. The 2003 Amendment sought only to include Valley County, Montana, as a party to the 2000 CDA. Trooper Moon already possessed cross-deputization authority under the 2000 CDA. The tribal executive board confirmed Trooper Moon's status in a tribal resolution that provided that Trooper Moon's status would be continuous unless otherwise terminated under Section IX of the 2000 CDA. Doc. 28-2; Doc. 28-1 at 16. The 2003 Amendment has no bearing on the validity of the 2000 CDA as it relates to the original parties. Any deficiency in the 2003 Amendment would serve only to draw into question Valley County's status as a party to the 2000 CDA.

The 2000 CDA, not the 2003 Amendment, sought to cross-deputize certain MHP troopers. The Tribes commissioned Trooper Moon pursuant to the 2000 CDA and subsequently adopted his status by tribal resolution. Fowler's reliance on a technical deficiency to a later amendment proves unavailing. Trooper Moon's authority to act in this case derives from tribal law. Whether the federal government approved this in the 2003 Amendment proves wholly irrelevant.

### THE TRAFFIC STOP.

As an MHP trooper, Trooper Moon possessed limited authority to enforce state law on Highway 2 against non-tribal members within the exterior boundaries of the FPIR. *See Bressi v. Ford*, 575 F.3d 891, 896 (9th Cir. 2009). As a cross-deputized officer, Trooper Moon possessed the authority of a tribal officer to enforce tribal laws against tribal members within the exterior boundaries of the FPIR. *See Fourstar*, at *2.

Trooper Moon's authority flowed from different sources as the stop progressed. Trooper Moon possesses the authority to stop Fowler within the exterior boundaries of the FPIR. *See United States v. Patch*, 114 F.3d 131 (9th Cir. 1997). State law enforcement officers may stop a car when the officers possess reasonable suspicion that the driver of the car has engaged in wrongdoing. *Terry v. Ohio*, 392 U.S. 1 (1968). Initial confusion existed regarding whether a state law enforcement officer with this authority may stop tribal members in Indian Country for state law

violations. The Ninth Circuit determined that "as a practical matter, without a stop and inquiry, it is impossible for [a state officer] to tell who is operating an offending vehicle." *Patch*, 114 F.3d at 133−34. In other words, it would be impossible for a state law enforcement officer to conduct stops of non-tribal members properly without first stopping cars to determine whether the driver was a non-tribal member.

In this case, Fowler was driving a car without a license plate or a temporary tag, in violation of Montana law. Trooper Moon, having seen this infraction, possessed the authority as an MHP trooper to stop Fowler's car to determine whether the driver was a non-tribal member to whom Trooper Moon could issue a state citation. *Id*. At the point that Trooper Moon recognized Fowler as a tribal member, Trooper Moon's authority to enforce state law expired. *See id*.

As a cross-deputized officer. however, Trooper Moon possessed authority to investigate violations of tribal law and enforce tribal law against tribal members. Driving without a license plate violates tribal law. 17 Fort Peck Tribes Comprehensive Code of Justice ("C.C.O.J.") § 132-A, *available at* http://fptc.org/comprehensive-code-of-justice-ccoj/ (accessed Jan. 15, 2021). Trooper Moon also issued the following citations for violations of tribal law: mandatory financial responsibility (17 C.C.O.J. § 132), driving without a seatbelt (17 C.C.O.J. § 131), and driving without a license (17 C.C.O.J. § 101). Trooper Moon included with these citations a summons to tribal court. Doc. 28-3.

**THE ID CARD.**

The swan song of Fowler's Motion to Suppress argues that the 2000 CDA requires that Trooper Moon carry an identification card that identifies the agencies under which Trooper Moon possesses authority to act. Doc. 28-2 at 12. The 2000 CDA requires cross-deputized officers to carry identifications cards. Doc. 28-3 at 12. The 2000 CDA also requires cross-deputized officers to present their identification cards whenever an individual requests to see them. Doc. 28-2 at 12. The record indicates that neither the Tribes nor the MHP issued Trooper Moon an identification card.

Fowler fails to cite any legal authority for his claim that the evidence found in his car needs to be suppressed because Trooper Moon lacked an identification card. Trooper Moon's failure to carry an identification card constitutes, at worst, a violation of the Tribe's police policy. Fowler suffered no prejudice from this omission. The 2000 CDA requires cross-deputized officers to display their identification cards when an individual request to see them. Nothing in the record indicates that Fowler requested to see Trooper Moon's identification card.

Motions to suppress have constitutional roots in the Fourth Amendment. *See Simmons v. United States*, 390 U.S. 377, 389 (1968). "In order to effectuate the Fourth Amendment's guarantee of freedom from unreasonable searches and seizures, this Court long ago conferred upon defendants in federal prosecutions the

right, upon motion and proof, to have excluded from trial evidence which had been secured by means of an unlawful search and seizure." *Id.* The Court fails to make the connection between any constitutional violation whose remedy is suppression with Trooper Moon's non-prejudicial violation of the 2000 CDA. The Tribes may take this violation into consideration when deciding whether to renew Trooper Moon's commission. Trooper Moon's failure to carry an identification card does not warrant suppression. *See* Doc. 28-3 at 12.

## CONCLUSION.

The 2000 CDA constitutes a valid agreement by which the Tribes cross-deputized Trooper Moon to enforce tribal law. At no time did Trooper Moon exceed his authority as a cross-deputized officer. The exists no reason to suppress any of the evidence found at the time of the stop or as a result of the subsequent search.

**IT IS HEREBY ORDERED**:

1. Defendant Eric Bruce Fowler's Motion to Suppress (Doc. 22) is **DENIED**.

Dated the 22nd day of January, 2021.

Brian Morris, Chief District Judge
United States District Court